UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHRISTOPHER GARRAWAY,

                Plaintiff,

      -against-                                                   05 Civ. 4594 (LAK)

THE SOLOMON R. GUGGENHEIM
FOUNDATION, et ano.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

               Jonathan Weinberger
               LAW OFFICES OF JONATHAN WEINBERGER
               *Attorneys for Plaintiff*

               David R. Lagasse
               M. Alexis Pennotti
               DREIER LLP
               *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiff Christopher Garraway was employed by defendants (collectively, the "Museum") as a shipping associate from 1992 until his termination in March 2005. He claims that defendants violated his rights under the Family and Medical Leave Act ("FMLA"),[1] the New York

---

[1] 29 U.S.C. § 2601 *et seq.*

2

State Human Rights Law ("NYSHRL"),[2] and the New York City Human Rights Law ("NYCHRL")[3] in that they discriminated and retaliated against him based on his alleged disability and his exercise of his rights under the FMLA and failed to afford him rights allegedly due him under the pertinent statutes. The Museum moves for summary judgment dismissing the complaint. Plaintiff cross-moves for summary judgment.

*Facts*

Although there are disputes as to an abundance of unimportant details, almost all of the material facts are undisputed. The following account consists of facts that are undisputed or, where disputed, plaintiff's version to the extent it is supported by admissible evidence.

*The Museum's Absence Policy*

Garraway reported to Wayne McKenzie, the warehouse manager, and Gerry Gonzales, the assistant warehouse manager. The Museum's written sick leave policy[4] stated in pertinent part:

> "Employees who are unable to report to work due to illness must telephone their supervisor ***directly***, each day of their absence, giving enough notice in order to arrange coverage. (Please refer to your Department Head for details.) If their supervisor is not available, the Human Resources Department should be contacted. If an employee is unable to make the call personally, a family member or a friend

---

[2] N.Y. EXEC. L. § 290 *et seq.*

[3] N.Y.C. AD. C. § 8-107.

[4] Garraway was aware of the policy, having signed a receipt for the handbook in which it appears. Garraway Dep. 90-91.

should contact the supervisor.  An employee who fails to contact his/her immediate supervisor or the Human Resources Department may be considered as having voluntarily resigned.  This policy must be followed unless an exception has been made for a particular absence, and a written memo to this effect has been sent to the Human Resources Department."[5]

The Museum acknowledges, however, that an employee who is absent on FMLA leave is not required to telephone his supervisor each day and would be obliged only to comply with its FMLA policies.[6]

*Garraway's Mental Condition*

Garraway suffers from a condition, among others, known as psychosis not otherwise specified.  He was hospitalized in 1998 because he "was hearing voices" and "would walk the street in the middle of the night[,] not knowing what [he was] doing because [he] had no control of what was going on" and again in 2003 for similar reasons.[7]  On at least the second of these occasions, the drug risperidone – which his present psychiatrist testified is "the standard treatment" for Mr.

---

[5] Legasse Decl. Ex. G, at 36 (emphasis in original).

Plaintiff claims that the policy was not strictly adhered to in his department.  Pl. Resp. to Def. Rule 56.1 St. ("Pl. Resp. 56.1 St.") ¶ 5.  The testimony he cites, however, is not inconsistent with the written policy.  He said that his practice if he was sick or unable to come to work was to telephone McKenzie or Gonzales.  Garraway Dep. 55-56.  When pressed as to why the identity of the person called varied, however, he said that he called Gonzalez if he had been unsuccessful in reaching McKenzie.  *Id.* 56.

[6] Chacko Dep. 53; Def. Resp. to Pl. Rule 56.1 St. ¶ 92.

[7] Garraway Dep. 82, 84.

4

Garraway's illness[8] – was prescribed. Garraway received FMLA leaves from the Museum on both of these occasions as well as an additional occasion in 2004 when he sustained a foot fracture.

*The Events Leading to Garraway's Termination*

On February 22, 2005, Garraway again began hearing voices. He was hospitalized from February 28 until March 7, 2005 and given risperidone.[9]

Garraway did not report for work during the period commencing on February 25 through March 17, the date on which he was terminated. It is undisputed that neither he nor anyone

---

[8] Pinkhasov 18.

There are references in the evidence to Risperdal. The Court takes judicial notice of the fact that Risperdal is a brand name for risperidone. U.S. Nat'l Library of Medicine, Medline Plus Drug Information, available at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694015.html#brand-names (last visited Feb. 15, 2005). It uses the generic term throughout this memorandum, regardless of whether the brand or the generic name appears in the evidence.

[9] Garraway Dep. 28-29, 31-32.  Def. Rule 56.1 St. ¶ 32.

The Museum portrays this hospitalization as a consequence of Garraway's failure to take risperidone as prescribed. His current psychiatrist, Dr. Pinkhasov, with whom he began treating in March 2005 (Pinkhasov Dep. 10), testified that risperidone is "the standard treatment" for his illness, that taking it is "the only way he's going to maintain being stable," and that his three hospitalizations (i.e., 1998, 2003 and 2005) were attributable to his failure to take medications. Pinkhasov Dep. 19, 21, 23. Garraway admitted that he was not taking risperidone or anything else prior to the February 2005 hospitalization. Garraway Dep. 33, 117. Records from his 2003 hospitalization show that risperidone was prescribed for him at that time. Legasse Decl. Ex. W.  Nevertheless, there is no direct evidence that risperidone was prescribed for Garraway for the entire period between his 2003 hospital discharge and the February 2005 incident. Such a conclusion would be an inference based significantly upon Dr. Pinkhasov's testimony that risperidone is "the standard treatment" for plaintiff's condition. As this is a motion for summary judgment, the Museum is not entitled to the benefit of an that inference, despite the fact that it is most compelling, because it is not entitled to the benefit of inferences that would be adverse to the non-moving party.

else called in to explain his absence before March 1. On that date, Garraway's father told an unidentified supervisor that plaintiff had been admitted to the hospital in connection with his mental illness,[10] and his parents made a similar contact again on March 4.[11]

On March 8, 2005, the day following his discharge from the hospital, Garraway called Gonzalez and, according to Garraway's deposition testimony, "told him that I'm out of the hospital. I'm going to – I have to go to the doctor to get a – a release to come back to work."[12] Gonzalez responded, "Okay, bro."[13] Three days later, Garraway spoke with McKenzie. Garraway's version of the conversation is that he told McKenzie that he was out of the hospital, that he had had an

---

[10] L. Garraway Decl. ¶ 4.

Plaintiff's response to defendant's Rule 56.1 statement claims also that plaintiff's brother contacted the Museum and refers to a "JG Dec." Pl. Resp. 56.1 St. ¶ 38. No such declaration was filed.

[11] Lagasse Decl. Ex. F.

[12] Garraway Dep. 42-43.

He said also that he may have told Gonzalez that he had the flu, but "can't remember." *Id.* 43.

[13] *Id.*

In a declaration submitted in opposition to the defendant's motion, Garraway gives a different account of the conversation, stating that he told Gonzalez "that I was going to get an appointment with my doctor when I felt better" and that Gonzalez responded that "this was o.k." Garraway Decl. ¶ 7. The change is significant, as the deposition testimony makes clear that Garraway, at least in his own mind, was ready to come back to work whereas the declaration at least implies that he thought that he was not ready to return.

"[A] party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir. 1991) (citing *Perma Res. & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)). The Court therefore disregards this aspect of Garraway's declaration.

6

anxiety attack, that he had come down with the flu, and that he was going to see the doctor on March 14 "to get a release to come back to work." McKenzie responded, "Okay, call me sometime next week" (i.e., the week of March 14) and added that "It's in the hands of personnel."[14]

Plaintiff saw a doctor on March 14 and obtained a note indicating that he would be ready to return to work on March 28.[15] He did not, however, contact the Museum again until March 17. In the meantime, the Museum on March 16 decided to terminate plaintiff. According to Michael Muccio, who made the decision, it did so because Garraway did not "follow[] the proper procedure with regard to calling in when he's sick."[16]

On the following day, March 17, plaintiff spoke to McKenzie. Regrettably, his attorney's intervention interfered with Garraway's deposition account of the conversation. The transcript reads in pertinent part as follows:

> "Q   What was the substance of your conversation with Mr. McKenzie on March 17th?   A   I told Mr. McKenzie that *I had got released to come back to work.* He

---

[14] Garraway Dep. 53-54.

[15] Weinberger Decl. Ex. 10.

[16] Muccio Dep. 20-21; Chacko Dep. 39.

Plaintiff's response to defendant's Rule 56.1 statement claims that the decision was made on March 17. Pl. Resp. 56.1 St. ¶ 62. The cited evidence (Chacko Dep. 37-39 and Weinberger Decl. Ex. 11), however, does not support that assertion. Chacko was reasonably sure that the decision was made on the 16th, but said that Muccio – who confirmed that fact – would know. The memorandum is dated March 17, and its text does not refer to plaintiff as having been terminated. The text, however, states that "[i]t is now the 16th and Wayne [McKenzie] has not received any communications from Chris at all as of now." The logical conclusion is that the memorandum was written on the 16th, before the decision had been made, but not printed until the 17th, at which time the word processing software automatically inserted the then-current date. In the last analysis, however, nothing turns on this.

said to me, well – to call Michael [Muccio].  Michael was over at the warehouse collecting information about me and to give – Michael said to give him a call.

"Q   Other than telling Mr. McKenzie that you were released to come back to work on March 17th, during that phone conversation, did you say anything else to him?
 A   I can't –

    "MR. WEINBERGER [plaintiff's counsel]:   *I don't think he said he was released to come back to work on the 17th, but that he had gotten the release, which is Exhibit B.  He didn't communicate that he was ready to come back to work on the 17th.*

    "MS. POLLAK [defendants' counsel]:    Okay. I'm sorry. That's my mistake.

*   *   *

    "Q   Can you just tell us one more time so we all understand the same thing?  What did you tell Mr. McKenzie when you called on March 17th about returning to work?    A    *I told him I got a return to work form* and he told me to call Michael.  Michael was over in the warehouse collecting information about me and to give Michael a call.

    "Q     When you spoke to Mr. McKenzie on March 17th, did you tell him when you were released to come back to work?    A    *I can't remember if I did.*"[17]

Thus, Garraway told McKenzie at least that he had obtained a return to work form, and he does not recall telling McKenzie that he was cleared to return only as of March 28.  McKenzie told plaintiff

---

17  Garraway Dep. 64-65 (emphasis added).

Counsel's intervention was improperly suggestive.  There was, to be sure, a legitimate objection to the form of the question that prompted the intervention, as the question was ambiguous as to whether it assumed that Garraway had been cleared to return to work on March 17 or cleared on March 17 to return to work at some unspecified time.  That point would have been made if counsel had confined himself to stopping after saying "I don't think he said he was released to come back on the 17th." But he went on to point out – with the obvious effect of suggesting the desired answer to his client – that all the client had received on the 17th was a return to work form, not clearance to return to work.  As the quoted testimony demonstrates, Garraway quickly adopted the suggestion.

to call Muccio.[18]  Plaintiff then did so, learning from Muccio that he had been fired.[19]

*Discussion*

A.   The FMLA Claim

Plaintiff claims that defendant violated the FMLA both by failing to afford him additional FMLA leave in 2005 and because it fired him on the basis of his 2005 absences notwithstanding that those absences allegedly were covered by the FMLA.

   1.   *Additional FMLA Leave*

As Judge McMahon recently wrote:

> "To make out a prima facie case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must establish five elements:   1) that she is an eligible employee under the FMLA; 2) that defendant is an employer as defined in FMLA; 3) that she was entitled to leave under FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under FMLA."[20]

The Museum does not dispute, at least for purposes of these motions, that plaintiff was an eligible employee, that the Museum is an employer for purposes of the Act, or that plaintiff was entitled to FMLA leave at the time he was terminated.  It contends, however, that the record establishes that he did not give notice of his intention to take additional leave in mid-March 2005 and, in consequence,

---

[18]   Garraway Dep. 66.

[19]   *Id.* 66-67.

[20]   *Geromanos v. Columbia Univ.,* 322 F. Supp.2d 420, 427 (S.D.N.Y. 2004).

9

that it therefore was entitled to terminate him for failure to comply with its absence policy.

The pertinent regulation provides as follows with respect to the requisite notice to the employer in circumstances such as these:

> "(a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.
>
> "(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. *The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.* The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation."[21]

"The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."[22]  Once the employee provides such notice, "the employer is on inquiry notice and bears the burden of ascertaining whether the leave qualifies for FMLA protection."[23]

---

[21] 29 C.F.R. § 825.303 (emphasis added).

[22] *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir. 1995).

[23] *Barnett v. Revere Smelting & Ref. Corp.,* 67 F. Supp.2d 378, 385 (S.D.N.Y. 1999).

The Museum does not dispute here that it was aware of Garraway's hospital admission, and thus of his need for FMLA leave, by March 1. Rather, it contends that Garraway never requested or informed it of any need for FMLA leave after he was discharged from the hospital on March 7 and that it therefore was within its rights in firing him for failing thereafter to comply with its absence policy. It pins its argument on the proposition that Garraway's statements on March 8 and 11 that he was out of the hospital and that he was going to the doctor to get "a release to come back to work" are inconsistent with any need for further FMLA leave.

The Museum's argument is unpersuasive in the summary judgment context. Garraway's March 8 and 11 statements that he was seeing the doctor on March 14 to get the release are susceptible of the inference that he had not yet been cleared to return to work and would require leave at least through March 14. The question thus comes down to whether a jury reasonably could find that the Museum thereafter was on sufficient notice to give rise to a duty to ascertain whether further leave was required. Given Garraway's history, which was well known to the Museum, the Court so concludes. The Museum's motion, insofar as it seeks dismissal of this claim, must be denied.

   2.   *The Termination*

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.[24] The regulations, moreover, make clear that "employers cannot use the taking of FMLA leave as a negative factor in employment

---

[24] 29 U.S.C. § 2615(a)(1).

actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies."[25]  Plaintiff claims that he was fired in whole or in part on the basis of his having taken FMLA leave and, moreover, that he is entitled to summary judgment on liability on that claim.  The Museum in turn claims that it is entitled to dismissal of this claim because it lacked notice that Garraway needed additional leave on or after March 8, 2005, an argument that presupposes that the firing was based only on his failure to call in on and after that date.

As noted, there is an issue of fact as to whether Garraway sufficiently notified the Museum of a need for leave beyond March 8.  *A fortiori,* there is an issue of fact as to whether the firing, to the extent based on the failure to call in thereafter, constituted interference with any attempt to exercise rights under the FMLA.  Moreover, it perhaps is arguable that a jury would be entitled to infer that the Museum was brought to act as it did at least in part because of plaintiff's repeated absences, which included FMLA leaves in 1998, 2003, 2004 and 2005.  Defendants therefore are not entitled to summary judgment on this claim.

Nor is plaintiff.  The record is susceptible also of the view that the Museum was not on sufficient notice of any need for FMLA leave after March 14 and perhaps after March 8 and that the termination was based on his failure to adhere to the call-in procedure only during a period in which he was not entitled to leave under the Act.

B.      *The Discrimination Claims*

Plaintiff claims also that the Museum's failure to give him additional leave and its

---

[25] 29 C.F.R. § 825.220(c).

termination of his employment constituted discrimination on the basis of a disability in violation of state and city anti-discrimination laws.

### 1.   *Alleged Failure to Take Medication*

The Museum begins its attack on the disability discrimination claim by asserting that plaintiff's psychosis is controllable by risperidone, that his hospitalizations and absences have been attributable to his failure to take the drug as prescribed, and that it cannot be held liable based on plaintiff's failure to do so.

Were it clear that plaintiff's problems were attributable simply to his failure to take prescribed medications, the argument would present interesting questions. For reasons explained above, however, the record – while it strongly supports the defendant on this point – is not sufficiently clear to permit such a conclusion on a motion for summary judgment.

### 2.   *The* McDonnell-Douglas *Analysis*

In adjudicating NYSHRL and NYCHRL discrimination claims, courts apply "the familiar burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*:"[26]

> "[A] plaintiff has the initial burden of making out a prima facie case of discrimination. This may be accomplished by showing (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class. Alternatively, the fourth prong of the prima facie case may be satisfied if the plaintiff can demonstrate that the

---

[26] *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 156 n.9 (2d Cir. 1998) (NYSHRL); *accord Dawson v. Bumble & Bumble,* 398 F.3d 211, 216-17 (2d Cir. 2005) (NYCHRL).

discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class.

"If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. The defendant is not required to prove that the articulated reason actually motivated its actions. 'If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested).'

"If the defendant bears its burden of production, the presumption drops out of the analysis, and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.' Evidence that the defendant's articulated nondiscriminatory reason is false, when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference that prohibited discrimination occurred' and warrant submitting the case to the jury."[27]

Here, the parties do not dispute that plaintiff has made out a *prima facie* case or that the Museum has articulated a legitimate, nondiscriminatory reason for the termination. The question therefore is whether the evidence compels or would permit a reasonable trier of fact to conclude that plaintiff's disability was a factor in the Museum's decision to terminate him.

Viewing the matter first from the perspective of the plaintiff's motion, it certainly cannot be said that the evidence compels a finding that plaintiff's disability was a factor in the decision. The Museum has advanced direct evidence, which a jury would be entitled to credit, that the reason for the termination was the failure to comply with the call-in procedure. Moreover, the Museum's repeated past accommodation of plaintiff's absences supports that view of the evidence. Plaintiff therefore is not entitled to summary judgment.

---

[27] *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98-99 (2d Cir. 2001) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000)) (citations omitted).

14

Nor are the defendants. A reasonable trier of fact might conclude from this evidence that the Museum seized upon the alleged failure to comply with the call-in procedure to fire him because it had accommodated him long enough, a view that draws some support from the fact that it decided to terminate him a mere two days after the doctor's appointment without making any further attempt to contact an employee, whom it knew to have mental problems, to determine his status.

*Conclusion*

For foregoing reasons, the cross-motions for summary judgment are denied. Plaintiff's counsel is directed to file his cross-motion and all supporting papers with the Clerk.

SO ORDERED.

Dated: February 16, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

15